**OFFICE OF THE FEDERAL PUBLIC DEFENDER**
**DISTRICT OF MARYLAND**
NORTHERN DIVISION
TOWER II, 9TH FLOOR
100 SOUTH CHARLES STREET
BALTIMORE, MARYLAND 21201-2705
TEL:  (410) 962-3962
FAX:  (410) 962-0872
TOLL FREE: (855) 213-8450

JAMES WYDA
FEDERAL PUBLIC DEFENDER

SHARI SILVER DERROW
ASSISTANT FEDERAL PUBLIC DEFENDER

**VIA CM/ECF**

April 3, 2023

The Honorable George L. Russell, III
United States District Court
        for the District of Maryland
101 West Lombard Street
Baltimore, Maryland 21201

        Re:  *United States v. Dana Hayes*, No. GLR-22-0224

Dear Judge Russell:

        I write in advance of Dana Hayes' sentencing hearing, scheduled for April 17, 2023.  As the Court is aware, Mr. Hayes has pleaded guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343.  ECF No. 26.  Under the terms of the plea agreement, the parties have reserved the right to advocate for a reasonable sentence.  *Id.*

        Probation and the parties agree that that the applicable guidelines range is 8-14 months, corresponding to a final offense level of 11 and a criminal history category I.  PSR ¶ 64.  As set forth in the Presentence Report ("PSR"), Mr. Hayes' adjusted offense level is based on the following calculations: base offense level of 7, plus 6 levels (due to loss amount of $50,036), minus 2 levels for acceptance of responsibility.  PSR ¶ 63; ECF No. 26 ¶ 6(d).  Mr. Hayes falls within a criminal history category I based on zero criminal history points.  PSR ¶ 65.  Mr. Hayes' resulting advisory guidelines range of 8-14 months falls within Zone B.  PSR ¶ 104.[1]  That guidelines range—which is exceedingly modest compared to the guidelines ranges of most

---

[1]        As the Court knows, in Zone B cases, the Guidelines allow the Court to impose a probationary sentence with a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention.  U.S.S.G. § 5B1.1(a)(2).  The U.S. Probation Office has recommended a split sentence of 30 days in prison, followed by three years of supervised release, with the first seven months on home detention.  PSR at 18-19.  As explained below, a period of incarceration would serve no productive purpose.

1

defendants in federal court, including most defendants convicted of federal fraud offenses—places Mr. Hayes' case in the heartland of cases for which a non-prison sentence is appropriate.

A prison sentence would exceed what is sufficient, but not greater than necessary, to accomplish the goals of sentencing under 18 U.S.C. § 3553(a). Born in Park Heights to a single-teenage mother, Mr. Hayes overcame steep odds to graduate from Dunbar High School and later Morgan State University. Mr. Hayes' mother—who worked her way through college and graduate school to eventually become a teacher in the Baltimore City Public School System—was his model and inspiration. Even as a college student, Mr. Hayes balanced a full-time job and many familial responsibilities, including caring for his then-infant daughter.

In 2020, after years of juggling numerous competing demands, Mr. Hayes made regrettable decisions that are totally contrary to his core values of hard work and persistence. He applied for loans for his business, D&L Investment Properties, submitting applications that contained false information. Mr. Hayes received a total of $50,036; he did not spend the money on lavish purchases, but instead used the money to help support his family. Mr. Hayes knows there is no excuse for his actions. He is exceedingly remorseful for his poor choices and has accepted full responsibility by entering a timely guilty plea in this case.

Mr. Hayes has already experienced serious consequences for his behavior. Mr. Hayes lost both of his jobs following his arrest, and spent the next three months searching for employment. He now works for a non-profit organization that provides housing to vulnerable populations, and also secured a second job as a counselor at a youth residential treatment center. Mr. Hayes speaks openly and honestly with young people at the program about his mistakes.

This case has been an enormous fall for Mr. Hayes. He is disappointed in himself and is acutely aware that he has disappointed his family. His sister calls his arrest "the first time in [her] life [she] was ashamed of [her] brother." Exhibit 4 (Letter from Taylor Sweat). Mr. Hayes has spent the past nearly one year since his arrest trying to earn back the trust of his family and his community.

For the reasons stated below, the Court should sentence Mr. Hayes to time served (two days and one night in custody), followed by three years of supervised release, with a period of eight months of home detention and community service as conditions of supervision.

**I.      Mr. Hayes is a hardworking family man, whose modest upbringing in a single-parent home in Park Heights motivated him to become the first man in his family to earn a college degree.**

### A.      Modest Roots

Mr. Hayes was born in January 1985 in Baltimore.  His mother, Tonya Lawrence, was a senior at Western High School when she became pregnant with Mr. Hayes.  Ms. Lawrence fought to remain at Western High School, rather than be sent to the Laurence G. Paquin School, an alternative school for pregnant teenage girls, because she felt Western offered a better education.  Mr. Hayes' father, Dana Hayes Sr., was incarcerated during much of his childhood and "did not have an impactful presence in [his son's] life."  Exhibit 1 (Letter from Dana Hayes).

Mr. Hayes and his mother lived in a single-family home in Park Heights with Mr. Hayes' grandparents and uncles.  His grandfather was employed as a truck driver, and his grandmother was employed at Bon Secours Hospital.  His grandparents' home was crowded, and the family struggled financially at times, but Mr. Hayes grew up feeling "blessed to have such a comforting family in my life." *Id.*

As a child, Mr. Hayes witnessed his mother balancing multiple jobs, school, and home life—a source of tremendous pride and inspiration for him and the example after which he modeled his own life.  After Ms. Lawrence graduated high school, she secured employment at a bank.  While working to support her family, she also pursued higher education at Strayer Business College, Coppin State University, where she earned her Bachelor's Degree, and Notre Dame of Maryland University, where she earned her Master's Degree.  Ms. Lawrence eventually became an elementary school teacher in the Baltimore City Public School System.  Once Ms. Lawrence became more financially stable, she moved the family to the Northwood neighborhood.

### B.      Commitment to Family and Education

While living in the Northwood neighborhood, Mr. Hayes graduated from Dunbar High School in 2003, and was accepted to Morgan State University.  Even after enrolling at Morgan, Mr. Hayes worked full-time to pay for tuition and help support the household.  He also remained an involved family member, particularly to his two younger sisters and two young cousins.  Ms. Lawrence recalls that, while Mr. Hayes was a student at Morgan, his uncle left Baltimore to attend a junior college in Texas, leaving behind two young children, Janaya and Jaylin.  Ms. Lawrence states that Mr. Hayes was a "full-time father figure" to cousins Janaya and Jaylin. Exhibit 2 (Letter from Tonya Lawrence).

Mr. Hayes' responsibilities continued growing, even as he balanced school, work, and home life. In 2006, Mr. Hayes began dating a woman with a two-month-old baby, Rhian. From that point on, he raised Rhian as his own daughter.

In 2009, Mr. Hayes graduated from Morgan, becoming the first man in his family to earn a college degree. Ms. Lawrence describes Mr. Hayes' college graduation as "one of the proudest moments [of] a single, black mother." Exhibit 2. Mr. Hayes' sister, Marche' Sweat, likewise calls his graduation a "monumental occasion;" "[g]rowing up as an African American male in Baltimore City, my brother had the odds stacked against him from a young age," but he "always told me to never take the easy way out and taught me the importance of hard work and effort." Exhibit 3 (Letter from Marche' Sweat). Similarly, Mr. Hayes' youngest sister, Taylor Sweat, remarks:

> Mr. Hayes is an educated, successful black man; that has beaten obstacles that are placed to hinder black men from succeeding. It seems as if the birth rights of life, liberty, and the pursuit of happiness are contradictory to a lot of men of color. However, Mr. Hayes fought through those obstacles . . . . That is the perseverance of Dana Hayes.

Exhibit 4 (Letter from Taylor Sweat).

### C.    Tireless Work Ethic and Devotion to Community

After graduating from college, Mr. Hayes began working as an internal auditor for the State of Maryland.[2] He purchased his first home—"a major accomplishment [he] could scratch off [his] bucket list"—and a year later, he welcomed his son, DaCarlo. Exhibit 1. At that point, Mr. Hayes was supporting two children, in addition to helping with household expenses for his mother, grandmother, and sisters.

To earn extra income, Mr. Hayes began renting rooms in his house. His foray into the rental property business eventually inspired him to start his own business, D&L Investment Properties. With the assistance of his family, Mr. Hayes was able to purchase a house that he flipped in 2019. In 2021, Mr. Hayes started D&L Trucking Company to lease a truck to contractors for a fee. PSR ¶ 99. Mr. Hayes was extremely proud to provide for his family and was particularly proud to provide for them through his entrepreneurship.

---

[2]    As noted in the PSR, Mr. Hayes worked for ten years as an internal auditor for the State of Maryland. PSR ¶ 98. After that, Mr. Hayes was employed as an accountant for Strong City Baltimore, and later performed financial analysis for Baltimore Regional Housing Partnership. PSR ¶¶ 96-97.

4

Moreover, as hard as Mr. Hayes worked to support his family, he was equally committed to giving back to his community. Raschid Smith—a licensed clinical social worker and the President/CEO of AGS Programs (Achieving Your Greatest Self), a behavioral health program—describes Mr. Hayes' volunteer work for the program, including participating in a back-to-school rally and Christmas giveaway events. *See* Exhibit 5 (Letter from Raschid Smith). Mr. Smith writes:

> I can attest that Mr. Hayes is a man of great integrity, always accepts his responsibilities, and is extremely dedicated to any endeavor he pursues as well as his family. Mr. Hayes is a true example of a person who's faced with various adversities however always displays the definition of being resilient. I believe Mr. Hayes['] greatest strength is his ability to learn. He is capable, intelligent, loving, trustworthy, and determined.

*Id.*; *see also* Exhibit 6 (Letter from Dr. Cassondra Humphrey) (describing how Mr. Hayes helped Dr. Humphrey when she was new to the area; "I have observed him being caring, [a] hard-worker and also always willing to help others in less fortunate situations").

Through his volunteer work, Mr. Hayes formed relationships with youth in the community. Taylor describes how Mr. Hayes took boys in the community "to the gym to teach them to be more health conscious, and to football/basketball games at local high schools and HBCUs." Exhibit 4. Marche' likewise writes that Mr. Hayes has "tak[en] time out of his weekend to spend with young boys trying to encourage them to stay the course and not go down the wrong path." Exhibit 3; *see also* Exhibit 2 (discussing how Mr. Hayes is a "mentor to younger boys").

### D.    Balancing Many Competing Demands

While Mr. Hayes derived a great deal of personal satisfaction from his work and community service, he felt enormous pressure to keep up his breakneck schedule, while also remaining an involved father, son, grandson, and uncle. Mr. Hayes' mother had shown him what hard work looked like, and he never wanted to let her or the rest of his family down.

Ms. Lawrence recognizes that Mr. Hayes has a tendency to burn the candle at both ends:

> My son has always been a giver, caretaker, and provider for others. I feel Dana is sometimes burdened with having a good heart and doing for others before himself. I am proud I raised a son that is thoughtful, kind, and generous; however, I should have taught him not to stretch himself out so thin.

Exhibit 2; *see also* Exhibit 4 (stating that Mr. Hayes "tries to stretch himself out to be there for others").

Mr. Hayes, for his part, is endlessly grateful for the remarkable example his mother has set. He has aspired to live his life with the core values of hard work and persistence she has instilled in him. Mr. Hayes recognizes that his conduct in this case is at odds with those values, and he is deeply ashamed and disappointed that he has let himself, his family, and his community down.

**II.      Mr. Hayes' conduct in this case—which was borne of a desire to support his family—was aberrant, and he is now working two jobs to pay restitution.**

The conduct in this case represents an aberration in Mr. Hayes' otherwise upstanding and law-abiding life. Mr. Hayes has never before been charged, much less convicted, of a fraud offense. In 2020, Mr. Hayes was struggling to support the many family members he had assisted throughout the years. D&L Investment Properties had operated at a loss the year before. Mr. Hayes was working full-time as an accountant, but his income did not stretch far enough to provide for not only himself and his children, but also his mother, sisters, and other family members. Mr. Hayes made regrettable decisions to apply for loans from the Economic Injury Disaster Loan ("EIDL") program and the Paycheck Protection Program ("PPP"), submitting applications that contained false information about the number of employees and payroll expenses of D&L Investment Properties. In all, Mr. Hayes received two payments from the EIDL program and two PPP loans; he received a total of $50,036. He did not spend the money on lavish purchases. Rather, he used the money to help support his family. Mr. Hayes is full of remorse for his "very irresponsible decisions" and knows he "went about [trying to support his family] in completely the wrong way." Exhibit 1.

Mr. Hayes' arrest was a devastating blow. His family's disappointment was agonizing. Mr. Hayes let down the people he most wanted to help. When Mr. Hayes was arrested, he was working two accounting jobs; he lost both in close succession. Mr. Hayes was unsure he would ever be able to work again as an accountant. The prospect of his career ending was distressing. The prospect of being unable to support his family was terrifying. But Mr. Hayes refused to succumb to fear and anxiety; he knew that he had work to do to right his wrongs. Mr. Hayes wasted no time and began an exhaustive job search.

Mr. Hayes was told "no" many times during his job search, but his diligence eventually paid off. About three months after his arrest in this case, Mr. Hayes secured employment as an accountant for Prologue Inc., a non-profit organization that offers housing to vulnerable populations. Even after securing that job, Mr. Hayes continued looking for opportunities to supplement his income, while also giving back to his community. This past January, he was hired as a residential counselor at Nexus-Woodbourne Family Healing, a non-profit organization that provides residential treatment for youth between the ages of 12-21. Mr. Hayes takes every opportunity he can to speak with the young men at Nexus "about mistakes I have made and understanding the consequences I face for said actions." Exhibit 1.

Shaneece Hemsley, a unit coordinator at Nexus, describes Mr. Hayes as "an awesome asset to the youth we serve." Exhibit 7 (Letter from Shaneece Hemsley). Ms. Hemsley writes:

Mr. Hayes has demonstrated his ability to teach our youth daily new life skills, committed to providing a safe environment that is free from re- traumatizing stimuli, and building coping skills that will help them continue on their path towards wellness. If I could describe Mr. Hayes as a person and his work ethics, it would be a man of humility, grace, integrity, innovation, dependable, and a person with emotional intelligence. I can remember [an] incident with one of the youth who we had to place in an Emergency Safety Intervention (restraint), Mr. Hayes was able to quickly to escalate the individual with his sense of passion and calmness. While working with Mr. Hayes he has been my "Go to Guy" during his shifts and even picking up extra shifts. Always assuring and making his self-committed to breaking the cycles of the youth so that their healing can begin. It is an honor and privilege to work along side Mr. Hayes, he has been [an] instrument of inspiration not only for the youth we serve but his co workers as well.

*Id.*

Mr. Hayes' conduct since his arrest is emblematic of his remorse, his commitment never to repeat the same mistakes, and his return to the fundamental values with which he was raised. Mr. Hayes is "100% dedicated to making things right" and working hard to repay every dollar of restitution. Exhibit 1; *see also* Exhibit 8 (Letter from Maurice Sweat) ("I know Dana is remorseful . . . .").

> **III.    Mr. Hayes' modest advisory guidelines range places him in the heartland of probationary cases.**

As the chart on the next page demonstrates, the Court has imposed non-custodial sentences in fraud cases with more aggravated (and prolonged) conduct than the conduct involved here, including cases where the guidelines range was higher than Mr. Hayes' modest advisory guidelines range of 8-14 months:

7

| | Facts and Sentencing Guidelines[3] | Sentence | Loss |
|---|---|---|---|
| US v. William Simms, ELH-15-0246 | Theft of government property. For almost 5 years, Defendant failed to report work that would have disqualified him from receiving any social security benefits.<br><br>OL 10 / CHC I = 6-12 months | 3 yrs probation to include 100 hrs of community service | $60,890 |
| US v. Leroy Kamzura, CCB-18-0582 | Theft of government property, federal employees' compensation fraud, and social security fraud. Defendant failed to report work as a mover for a period of 7 years.<br><br>OL 13 / CHC I = 12-18 months | 1 yr probation, all on home detention | $177,132 |
| US v. Teresa Maxfield, RDB-18-0443 | Theft of government property. For 4 years, Defendant spent her deceased mother's monthly federal employee pension annuity payments and concealed and did not disclose her death.<br><br>OL 10 / CHC I = 6-12 months | 5 yrs probation to include 12 mos at rehabilitation facility | $78,201 |
| US v. Frederick Kellner, DKC-19-0267 | Theft of government property. For nearly 27 years, Defendant converted to his own use his parent's retirement benefits.<br><br>OL 15 / CHC II = 21-27 months | 5 yrs probation to include 6 mos home detention | $356,577 |
| US v. Craig Colbert, GJH-19-093 | Theft of government property. For 10 years, Defendant converted his deceased father's retirement benefits to his own use.<br><br>OL 13 / CHC I = 12-18 months | 4 yrs probation to include 9 mos home detention | $216,290 |
| US v. Gloria Wilson, CCB-15-0633 | Theft of government property. For almost 17.5 years, Defendant received her stepmother's SSA benefits.<br><br>OL 13 / CHC I = 12-18 months | 3 yrs probation to include 8 mos home detention & 100 hrs community service | $176,874 |
| US v. Keisha Jones, RDB-18-0590 | Theft of government property. For nearly 20 years, Defendant received SSI while concealing and not disclosing marriage.<br><br>OL 12 / CHC I = 10-16 months | 3 yrs probation to include 12 mos home detention | $145,044 |

---

[3] Sentencing guidelines range based on an assumed criminal history category I unless otherwise stated on the docket.

| US v. Betty Ann Garner-Newby, PWG-19-0157 | Theft of government property. For almost 25 years, Defendant stole retirement annuity payments for a deceased victim; not only did Defendant fail to report the death, she twice submitted forms falsely indicating that the victim remained alive.<br><br>OL 10 / CHC I = 6-12 months | 3 yrs probation to include 18 mos home detention | $325,191 |
|---|---|---|---|
| US v. Stanley Pokropski, PWG-19-0176 | Mail fraud and false statements to obtain federal employees' compensation. Defendant submitted for reimbursement 1,563 fake travel claims to see doctors and to visit hospitals and a pharmacy that did not happen and were, at least part of the time, grossly overestimated.<br><br>OL 13 / CHC I = 12-18 months | 4 yrs probation to include 18 mos home detention | $140,255 |
| US v. Warren Fox, RDB-21-0367 | Theft of government property. Defendant was the owner and CEO of a home health agency that ceased operating in June 2019, months before the onset of the COVID-19 pandemic. About 10 months after the Defendant's business permanently closed, he accepted $81,564 from the Provider Relief Fund, which was designed to buoy health care providers during the public health crisis, and converted the funds for personal use.<br><br>OL 10 / CHC I = 6-12 months | 1 yr probation | $81,564 |

By contrast, the Court has reserved jail sentences in PPP fraud cases where the loss amount exceeded the six figures and/or the defendant had a prior criminal record. Even in those cases, the Court has granted significant downward variances from the applicable guidelines range:

9

| | Facts and Sentencing Guidelines | Sentence | Loss |
|---|---|---|---|
| US v. Brandon Fitzgerald-Holley, GJH-21-0250 | Wire fraud. Defendant obtained $305,854 PPP loan for a non-operational non-profit organization after previously applying for EIDL funds and being denied. Falsified tax documents and submitted the fraudulent documents to obtain the loan. Defendant used the loan proceeds for personal use, including purchasing a Dodge Charger and accessories, totaling more than $84,000, renting luxury vacation properties, and withdrawing more than $64,000 in cash and spending over $23,000 on other personal items in the 30 days following his receipt of the fraud proceeds. Defendant also admitted to law enforcement that he was receiving disability payments while employed.<br><br>OL 16 / CHC I = 21-27 months | 6 mos in prison, 3 yrs supervised release to include 6 mos home detention | $305,854 |
| US v. Sherrie Bryant, DLB-22-00308 | Wire fraud. Defendant submitted fraudulent PPP and EIDL loans for a business whose stated purpose was to provide mentorship and education to underserved youth. Defendant repeatedly misrepresented that she had never been convicted of a crime. Obtained $419,100 in fraudulent loans proceeds, which were used in part to pay for a car, a boat, a vacation, and tickets to sporting events. This case represented the Defendant's third federal fraud conviction, and the defendant was on federal supervised release at the time of the instant conduct.<br><br>OL 16 / CHC III = 27-33 months | 12 mos in prison (plus consecutive 6 mo sentence for VOSR), 3 yrs supervised release | $419,100 |

In sum, a sentence of time served, with a substantial period of home confinement and community service as conditions of supervised release, would avoid unwarranted sentencing disparities.

**IV.     A sentence of time served, with a substantial period of supervised release, home confinement, and community service, promotes respect for the law, provides just punishment for the offense, and affords adequate deterrence.**

Mr. Hayes has already been significantly punished—and a strong message of deterrence has already been sent—in a number of ways.

<u>First</u>, Mr. Hayes now has a federal felony conviction on his record for the rest of his life, which on its own provides ample deterrence to him and the public.  No one wants to experience the enormous fall Mr. Hayes has experienced.  No one wants to experience the tremendous stress and anxiety of a federal prosecution, the reputational harm that results, or the significant collateral consequences of a federal felony conviction, including loss of employment and diminished opportunities for the future.  Mr. Hayes has spent many sleepless nights worried that he will be unable to continue in his chosen profession once he is sentenced.  For Mr. Hayes, who has overcome many obstacles to pursue a career in accounting and spent his entire career in that field, the prospect of needing to find a new profession to support his family is deeply worrisome.

<u>Second</u>, being on federal supervised release—let alone being on federal supervised release with a significant period of home detention—is a significant sanction.  Mr. Hayes' movements will be severely restricted.  His ability to participate in family events will be severely restricted.  And his privacy will be severely restricted (indeed, it already has been while he has been subject to pretrial supervision since June 30, 2022).  Taken together, the substantial restrictions on Mr. Hayes' liberty and privacy attendant to a period of supervised release—along with conditions requiring community service and the timely repayment of restitution and forfeiture—are sufficient, but not greater than necessary, to ensure punishment, deterrence, and respect for the law.[4]

<u>Third</u>, Mr. Hayes has experienced shame and regret while dealing with this case for a significant period of time.  Because Mr. Hayes held the position of Chief of Fiscal Services for the Baltimore City Police Department for nine days in April 2022 (months after the conduct in this case concluded), this case received some local press attention when Mr. Hayes was arrested.  The press attention magnified Mr. Hayes' humiliation.  Taylor writes: "I cannot lie, when I learned of the charges brought against Mr. Hayes, the first time in my life I was ashamed of my brother.  I was ashamed because he had stained an image his children, my children, his mentees, and society had seen him as." Exhibit 4.  Having his family look at him differently, particularly when his mother worked so hard for him to have the opportunities he had, has been painful.  Mr. Hayes knows he has let himself and his loved ones down.

---

[4]    Research supports that increasing the severity of Mr. Hayes' punishment will not add any deterrent effect.  It is the certainty, rather than the length, of a sentence that has the deterrent effect.  *See* David Weisburd et al., "Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes," 33 Criminology 587 (1995) ("There is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through deterrence mechanisms."); Ben Johnston, "Do Criminal Laws Deter Crime? Deterrence Theory in Criminal Justice Policy: A Primer," Minnesota House Research Department 6 (Jan. 2019); Ray Paternoster, "How Much Do We Really Know About Criminal Deterrence?," 100 J. Crim. L. & Criminology 765, 801 (2010); National Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences* 90 (2014).

Mr. Hayes has begun the hard work of rebuilding trust with his family and community. He has accepted full responsibility for his actions by pleading guilty before this Court, and he has had many conversations with his family members about his remorse for his conduct and his determination to do everything he can to make amends for his conduct. As Marche' explains:

> Over conversations I have engaged in with Dana it is apparent that he is as disappointed in himself, if not more than, as I am. This pressure of this case has created a great sense of self reflection in Dana and made him rethink his core values, the ones he has exhibited throughout his life; those values of community, family, perservance [sic], and honesty.

Exhibit 3; *see also* Exhibit 2 ("My son has genuinely learned from this case . . . ."); Exhibit 4 ("I strongly believe Mr. Hayes has learned from the actions of this case.").

Mr. Hayes does not need to be incarcerated to achieve deterrence, respect for the law, or just punishment.

**V.      Conclusion**

For the reasons stated above, Mr. Hayes respectfully requests that the Court sentence him to time served, followed by three years of supervised release, with a period of eight months of home detention and community service. A prison sentence would be excessive in this case. I thank the Court for its attention to this matter.

Sincerely,

/s/

Shari Silver Derrow
Assistant Federal Public Defender

cc:      Aaron Zelinsky, Assistant U.S. Attorney
Paige Cameron, U.S. Probation Officer